Good morning, Your Honors. Paula Litt on behalf of Sears Roebuck & Co. This is a contract case. It's not a case about statutory construction of arcane and difficult interstate commerce law. It is not concerned with protectionist policies prohibiting rate discrimination in interstate commerce. The issue in this case is what was the contract for carriage among the parties. The district court correctly found that Oak Harbor, the carrier, had entered a contract with NLC under which Oak Harbor agreed to look to NLC, and NLC, the broker, agreed to pay Oak Harbor for freight shipments. And NLC made that promise to pay regardless of whether NLC itself had been paid for the shipments. Oak Harbor secured a judgment for the full amount of its damages against NLC in the district court based on the carrier contract. In reaching that conclusion to enter that judgment, the district court correctly referred to a law that was announced by the Supreme Court in 1924 and repeated by this Court in Carr v. Darden. The parties to a shipping transaction are free to contract when and by whom payment will be made, and when they do, the default provisions of bills of lading are irrelevant. That rule required the district court to examine the bills of lading in relation to the carrier contract, look at the transaction that had been going on among these parties for 12 years that all agreed to, that all profited by, to determine what the contract for carriage was. And the district court did not do that. The district court imposed an artificial distinction that was not reflective of the undisputed commercial reality between the parties, and it viewed the carrier contract in complete isolation from the bills of lading. Neither the law, the documents in the record, nor the undisputed testimony supported that view of them as separate from one another. And when the district court then focused solely on the bills of lading, it applied what it viewed as a rule of law that has not been adopted, which is that the bill of lading is always the contract for carriage, binding, in this case, the owner of the goods, in the absence of an express waiver to the contractor. Binding no express waiver, the district court entered summary judgment against Sears as well. The rule that the district court applied was rejected by the Supreme Court in 1924 in Louisville and Nashville Railway v. Central Iron. There, the court said, and I quote, "...delivery of goods to a carrier for shipment does not, under the Interstate Commerce Act, impose upon a shipper an absolute obligation to pay the freight charges." In that case, the concern was that a carrier had not collected its tariff rates, the rates that were published and were made available to the general public. And even there, the Supreme Court examined the facts and circumstances of the shipping transaction, did not apply an automatic rule, recognized that the issue was one of contract, and in that case, the carrier was not able to collect its full tariff from, in that case, the consignor. I think every case you rely on involves exonerating a shipper who had contracted for something other than what the bill of lading provided. The shipper was a party to the contract. That is a point that the district court relied on, and we think it's of no moment here because the carrier here was a party to the contract. And I think that the concern, there are certainly cases where the shipper was not a party to the contract. In Wiley, for example, there were two separate contracts. In Wohlform, there were two separate contracts. The issue of concern is, did the carrier, was the carrier complicitous? Did the carrier enter this contractual arrangement fully aware and fully knowledgeable of how it was going to work? In many of these cases, the carrier is a stranger to the transaction. Carrier gets the goods maybe from a freight forwarder, maybe from another carrier. They have no relationship, let alone an ongoing relationship, let alone a 12-year relationship or more with the shipper. Here the carrier contracted with NLC, and at that point in 1992, when they entered the contract, NLC was the shipper. NLC had to be the shipper under the law that was then in force, and that's what the carrier contract recites. It refers to NLC as the broker-shipper. The --" in Carr v. Darden, this Court also looked at the relationship between the bills of lading and other documents and did not view the bill of lading in isolation. In fact, if the Court had viewed the bills of lading in isolation, the Court would have reached a different result. Because the bills of lading in Carr v. Darden did not contain a release of liability. The Court had to look at the entire shipping transaction and find that in other documents executed by the drivers, the liability had been released. Now, the district court read Carr to announce a black-and-white rule, that the bill of lading is the contract in the absence of a release. We don't read Carr so narrowly, and we think Carr, like Louisville, like the case of Wiley, like Jackson, and like Wolfram, all require that the Court look at the transaction between the parties. When the Court does that here, the undisputed evidence indicates that when the parties entered the carrier contract in 1992, they intended to comply with the law at the time. There's no dispute as to what that law required. And that law required that a carrier like Oak Harbor that wanted to transport goods at discounted rates had to enter a written contract for carriage separate from the bill of lading. That requirement of separate wasn't in the 1992 Act. That was added a couple of years later. Well, you're correct, Your Honor, except for this. Later, the Service Transportation Board, in explaining its what it was doing in the subsequent statute, said that we were always intending to codify what the regulation was. And the regulation intended separate from the bill of lading. Also, in reading the regulation ---- Separate but not exclusive. There was nothing in the law that required that the carrier contract was the exclusive source of the rights and liabilities of the parties. That's correct. The law did require that the carrier contract was the exclusive means to lawfully transport at discounted rates. So the statute, the regulation, in effect, that was superseded later on, talks about the fact that goods can only be transported at discounted rates pursuant to a written agreement with a particular shipper. I think it's implicit in the statute, but I agree with Your Honor that the specific language separate from a bill of lading comes in later when the Service Transportation Board says we're just codifying what the regulation was before. There's no change. Your Honor is correct. There's nothing that precludes or that requires that the contract be exclusive, but it was here, and that is what the parties intended. And that manifests not only by their testimony, that they intended to comply with the law at the time, but also their testimony that nothing changed. Over their 12-year history, they performed in the same manner throughout their entire relationship. Oak Harbor admits in its brief that it's true, the parties performed the same way throughout the 12 years. And they all but admit that it was true at the time they entered the carrier contract that that had to be the contract for carriage. But they say it doesn't matter between who and whom. Who had to sign that contract? For the shipping transaction. And that gets corroborated. Who had to sign the shipping contract under your understanding of the regulations at the time? What parties? The shipper. A particular shipper. And in this case, under the Dixie case, the shipper was the broker, NLC. Okay. So who's bound by what? What two parties are bound by that contract? Well, we think all three parties are bound. What two parties signed that contract? The shipper, NLC, signed the contract. And Oak Harbor signed the contract. But that distinction. And Sears did not, correct? That's correct. But Sears was aware of the contract. I mean, the testimony from Oak Harbor is Sears. But the appeals of lading to which Sears was a party did not make any reference to the other contract and were not marked either prepaid in the one direction or nonrecourse in the other. Correct? They were marked prepaid. And they did refer to the existence of another contract because they said send bills to NLC. And there was no reference of a shipper. There was no the line for shipper was not completed. And the bills of lading didn't have a price. And that's critically important. And this, again, goes to the need to view them together, not in isolation, because the bill of lading could not have stood on its own as a contract in the absence of a price. Oak Harbor's answer to that is, well, it referred to the tariff. And the problem with that is that everybody agrees that the tariff price was not the correct price. It was not the price that Sears, via NLC, was being charged for freight shipments. NLC had negotiated a completely different rate. So in the absence of price, the bill of lading serves as a receipt and it serves as evidence of title, but it does not and it need not serve as a contract for carriage. And our point is, Your Honor, all the parties here understood that this was a three-way agreement and, frankly, Oak Harbor was at the hub of it. Oak Harbor entered the carrier contract with NLC. Oak Harbor engaged in the shipping transaction for 12 years, well, more than 12 years with Sears, and throughout that entire agreement, the parties understood that it was NLC, not Sears, that would pay Oak Harbor. Significantly, there's no testimony in this record that Oak Harbor, at the time it entered the contract, actually believed that the bills of lading were the contracts for carriage. Mr. Hartman, who signed the carrier contract, testified that the only contract that he was aware of for the shipment of Sears goods was the carrier contract. That testimony is at SR 69, Exhibit H at page 5. Mr. Hartman also testified that when he at one point he's talking about tariffs and he was asked, would the terms and conditions of the tariff apply, and he said, well, no, not if it's contract carriage. So the parties understood that this was contract carriage at the time it was entered. It was contract carriage throughout its existence, and they all understood how this arrangement worked. By separating the carrier contract from the bills of lading, the district court elevated the bills of lading to a presumptive contract, viewed them in isolation of the reality of this shipping transaction here, and then applied a formulaic rule that doesn't apply in this context. The importance of the absence of price can't be stressed because it is a factor that the district court failed to do. At an oral argument below, counsel for Oak Harbor was asked, how could Sears be sure that it wouldn't be charged the tariff price, the tariff price being significantly higher than the negotiated price? And the question arose because the bills of lading only refer to the tariff and have no price term in them. Counsel for Oak Harbor responded, well, of course we couldn't charge them more than the tariff because we're bound by the prices negotiated under the carrier contract. That admission brings the two together, acknowledges that one is dependent on the other. Well, even if they're read together, though, the amount to be paid and the entity who has to pay could live side by side. In other words, the fact that the prices come out of the carrier contract doesn't all by itself seem to negate the logic of who is responsible for paying that amount. Well, in and of itself it may not, but taken together with the carrier contract entered, according to Oak Harbor at Sears' request, performed under by Oak Harbor for 12 years to the point that when NLC stopped paying, Oak Harbor didn't come to Sears. Oak Harbor, the payments in the record showed that as early as January of 2004 NLC stopped paying. Oak Harbor didn't call Sears. Oak Harbor said we didn't enter a contract with NLC to be paid when they get paid by Sears. We want our payment from NLC. So the understanding of the parties was that the carrier contract was the contract for carriage. That only changed when Oak Harbor decided it needed somebody to chase after because as is often the case here, the broker went bankrupt. Well, it didn't. Sears never paid everything that it owed either to the tune of a couple hundred thousand dollars. The record reflects that Sears paid $227,000 to NLC. Out of 400 and something that was owed. That's correct. So had Sears paid that to NLC, presumably NLC could have paid it to Oak Harbor. Presumably. But at that point Oak Harbor initiated this litigation and chose to pursue the litigation as the means of resolving this dispute. There's nothing in the record that indicates what happened with NLC. Does NLC still exist even though it's bankrupt? It never filed for bankruptcy to my knowledge and to my knowledge it does not still exist. It does not still exist. To my knowledge. But I haven't checked. I imagine that the people who were behind it are doing business in another form. Well, I'm sure this is not really a question. This is not really a legal question. But since Sears got a windfall in the amount of 200 and something thousand dollars, why isn't Sears willing to just pay that through to Oak Harbor? Well, Your Honor, I think you're asking me to discuss settlement negotiations of the parties and I'm afraid I can't do that here. But the reality is that Oak Harbor put all its eggs in one basket. Fairness here and equity is a tough litmus test for how to resolve the case. Well, you have raised an equitable argument in your briefs. We have. So it's not entirely off limits for me to ask you that. No, no. That's right, Judge. But, well, it's a tough way to resolve the case in Oak Harbor's favor, as the district court did. The district court refused to entertain our equitable argument, refused to even permit us to pursue an argument that Oak Harbor was a stop from seeking the entire amount from us because it was Oak Harbor that had extended credit. It was Oak Harbor that had allowed NLC to go beyond terms. I think there's another terribly important factor here, which is this is not perhaps the fifth case today to say this is not a typical case. But this is not a typical case. This is a whole calendar full of not typical cases this week. All the cases today are difficult. You won't find a case with a longstanding relationship among the parties like this. None of them contain this kind of relationship. At most, there may be our 10 or 12 shipments among the parties, not 12 years of business transactions among sophisticated business people who understood the risk they were undertaking. And in this case, I think it's fair to say Oak Harbor and Sears both bet on the wrong course. But in terms of our estoppel argument, we did ask the district court to entertain it. It refused as a matter of law to allow us to pursue that affirmative defense. If you want to save some time for rebuttal, you have a little over three minutes. I will. Thank you, Judge. Thank you. We'll hear from Mr. Hart. Good morning. Ken Hart on behalf of Oak Harbor. The reason that we're before the court today, frankly, is because my client got caught in the middle of a dispute between Sears and its bill-paying agent. It wasn't disputed that my client moved in excess of 3,300 shipments of Sears goods. It's not disputed they were Sears goods. It's not disputed that the shipments were all made successfully, all product arrived in good condition. It was never disputed my client didn't get paid. It was never disputed my client was owed in excess of $426,000 for moving that product. But when asked, both parties refused to admit any liability for any portion of that $426,000, leaving my client in the position of having to bring both of them to court. What was the ground of denial of the broker? The broker's position essentially was that the bill of lading was the controlling contract, that the bill of lading then required the shipper of the goods, the owner of the goods, Sears, to pay, and that the broker merely was an agent for Sears. Sears' position, as you just heard, was that the carrier contract controlled the transaction and the bills of lading were mere receipts. And your position is if you read them together, Sears was in the last resort, but the broker also was responsible. Presumably that's your way to put them together. Well, starting first with the carrier contract. The carrier contract had provisions that required that my client be paid within 30 days of tender of the invoices for payment. They were not paid simply to contract. That doesn't necessarily mean that Sears isn't also liable as the shipper, primarily liable as the shipper of the goods in the case of the Sears bills of lading that were used for the majority of the shipments and as the consignee for the shipments that were moved from Sears back to the warehouse. So as you pointed out in questions to counsel, nowhere in the carrier contract does it say anything about Sears being not liable ultimately for paying for the movement of its goods. As you also pointed out, even though Sears complains bitterly about having paid $227,000, I believe, to NLC that was never paid through to Oak Harbor, Sears admittedly hasn't paid anyone, not my client, not NLC, no one $200,000 for moving its freight. And when asked about that, what you got in response was nervous laughter, because there really is no defense to that. And Sears has come to this Court asking this Court to rule in equity that my client should be stopped from requesting payment from them. Well, when you come to a court asking equity, you should do equity. And in this case, that means at least paying for the shipments that were made and were never paid for. So just backing up a little bit, what this case really boils down to is two issues. Because Sears admitted during oral argument before Judge Zille that but for the carrier contract, if it never existed, that it, Sears, would be liable under the bills of lading. So Sears, in effect, agrees that their contracts, agrees that those contracts would bind them to pay for the shipping of their goods, but they claim that this carrier contract between NLC and Sears releases them from liability. That's a bit inconsistent with what I understood counsel to be saying today. I understood her argument today to be that the bills of lading were not a contract for carriage at all because they contained no price term, or if they do contain a price term, it's inconsistent with the amount of money described by the carrier contract. Assuming that to be their argument of the day, what is your specific response to the absence of a price term? Well, it is the argument, Your Honor, because they had a different admission during oral argument before Judge Zille. But I think that the contracts can be read together and consistently find liability for both parties. The reason that the bill of lading contained no price term is because it was unnecessary. The price for each shipment was based upon Oak Harbor's tariff. The tariff was incorporated by reference in each of the bills of lading, by specific language in each of the bills of lading. Well, you see, that makes the statement at oral argument in the district court understandable. It would be if there had been no contract of carriage, then, yes, we'd be liable on the bills of lading and we'd be liable at the higher tariff rate because there would have been no contract. But since there is a contract and a different price was negotiated, the bills of lading are just evidence of title and a receipt. No, I mean, counsel went on and on about how we need to look at the whole relationship between the parties. I don't necessarily disagree with that. The relationship between the parties was a three-legged stool. We had a bill-paying agent. The bill-paying agent had another function, and that was to negotiate rates on behalf of its client, Sears. Sears was NLC's only client. It was the only company they worked for. And on an annual basis, they would negotiate discounts to the published tariffs. So I don't see any problem with referring to the rate schedules that were appended to the carrier contract as filling in the blanks, so to speak, with regard to the cost of shipping the goods. And, by the way, there's no dispute about how much is owed. So it's, frankly, a red herring. The bills of lading, they had a box, did they, where Sears could have checked off something indicating they had no liability? Is that right? The bills of lading that were used for the outbound shipments from the mixer warehouse to Sears customers did not have the box to check. But Sears designed that bill of lading, and the testimony was from the Sears employee who was involved in designing the bill of lading, that they designed it to conform with the standard uniform straight bill of lading. And the standard uniform straight bill of lading incorporates all of these provisions, which includes the Section 7 provision that allows the shipper to include non-recourse terms in a bill of lading. They just simply didn't do it. The bills of lading that were used for the return shipments were Oak Harbor bills of lading. Those bills of lading did have the check the box non-recourse term in them. And it was not checked, correct? It was not checked. And those bills of lading were also marked to collect, which means that the consignee of the goods, the party that's to receive the goods under the bill, is primarily liable for paying the freight charges. In that case, since the moves were from customers back to Sears Warehouse, Sears was the designated consignee in those bills of lading. Incidentally, it was the owner of the goods being moved as well, so it was the shipper. So any way you come at it, Sears is liable for payment of those moves. So focusing on the carrier contract for a minute. Nowhere in the carrier contract is Sears mentioned. Sears is not a party. Nowhere in the carrier contract does it have language even remotely like the car case, which is the Ninth Circuit case that seems to be sort of the focus of the discussion here and below. In car, there was a specific written agreement signed by the drivers for the carriers releasing not only the shipper but the shipper's customer, the consignee, in three different ways. In one way, the carrier acknowledged in that agreement that they had no contract, either with the shipper or with the shipper's customer, the consignee. Also acknowledged that they would not, in an agreement that they would not, pursue either the shipper or the consignee for payment. And thirdly, the contract provided that you waive any right that you might otherwise have to pursue either the shipper or the consignee. Now, do we have anything like that in the carrier contract? We don't. Nothing even remotely like that. Sears had another opportunity, and that was to use the nonrecourse provisions in the Bill of Lading. They could have availed themselves of that. So they didn't use the nonrecourse provisions. They didn't they weren't parties to the carrier contract. And they didn't enter into any separate contract with O'Carver with nonrecourse terms. The only contractual relationship between Sears and O'Carver were these 3,386 Bills of Lading. So many opportunities to have availed themselves of nonrecourse terms, and they didn't avail themselves of any of those. There was another obvious way they could have avoided liability, and that would have been to pay my client directly. They chose for their own convenience to use NLC as their billing agent. And when they did that, they assumed the risk that one day, as happened here, NLC wouldn't pass the money through to my client, which brings us to the other argument that Sears wants to use as an excuse for not paying my client is admittedly owed, and that is estoppel. Now, you'll find lots of cases that talk about estoppel in the context of a consignee of the goods, the party that receives the goods. Generally, what you'll find in those cases is that the Bill of Lading that was delivered with the goods has what are called prepaid terms. And that means that at least a presumption is, based upon that prepaid term in the Bill of Lading, that the bill for shipping has already been paid. I can receive it, I can accept it, and I don't run the risk of having to pay. And the other component that you'll find typically in those cases is that the consignee of the goods has already paid someone. It's usually a middleman. It's a freight forwarder or it's a broker or someone like that. Not always, but that's a typical scenario. So they've paid once, and they are told when they take receipt of the goods that the freight has been prepaid. The courts find that they have a right to rely upon that. And so the concern there is double payment for the consignee in those circumstances. You don't find that as a typical concern when you're talking about the shipper of the goods. So if you look at the Southern Pacific Transportation Company case, that's at 456 U.S., and I apologize, I don't have the page site in front of me. That's what you'll take away from that case. The court there was concerned about double payment by consignees where they relied on prepaid terms in the Bill of Lading. And then you have several other circuits that say, when we're talking about the shipper, not the consignee, when we're talking about the party that owns the goods and delivered them to the carrier for the move, we're going to hold the shipper liable even if the shipper has already paid someone under particular circumstances. And the cases that I'm talking about are from three separate circuits. The Fourth Circuit, and that's the Hawkspire shipping case, which is discussed in the briefing. The Eleventh Circuit, which is the national shipping case, which is likewise discussed in the briefing. And the Fifth Circuit also ruled in Strachan shipping, likewise discussed in the briefing, that the shipper would be held liable even if the shipper had already paid. And why is that? Because the court looked at the policy underlying the rationale being that the middleman, the broker or the freight forwarder, whoever that party might be, has no assets. They rely entirely upon money that they receive from the shipper and sometimes from the carrier. But they're just a pass-through entity. Money moves in and out of that company. The carrier, therefore, must expect that the shipper is going to pay, even if the money passes through the hands of this middleman. That's where the money is coming from. They understand that. There's no economic motive, therefore, to release the shipper from liability in favor of this entity that has no assets and is relying upon the shipper for the money they need to get paid. And then lastly, this is an obvious one, the more parties that are liable, the better, because that increases the chances that the carrier is ultimately going to be paid from someone. So the consensus conclusion that you take away from those cases is that because the carrier has a contractual right to be paid by the shipper, if the shipper wants to avoid liability, the shipper's got to do one of three or four things. First of all, obvious, deal with a reputable broker. The other one is contract directly with the carrier for a release, and we talked about how you could do that. You could use the nonrecourse terms of the bill of lading, or you could have a separate contract with, in this case, Oak Harbor and Sears. There was no such separate contract. And the other one I mentioned earlier, and that is pay the carrier directly. And the courts concluded if you don't do that, you don't do any of those things, and you decide to use this third party for your convenience, that's okay, but you take the risk. So as between two innocent parties, the allocation of risk, those courts found, goes to the shipper, because the shipper has all these tools that it can use to avoid that problem. So when you apply that analysis to the case at Barr, and you look at the outbound shipments, the shipments moving from the mixer warehouse out to Sears customers, Sears chose NLC as its billing agent. Sears directed Oak Harbor to send its bills to NLC in a very direct way, as a matter of fact, the bills of lading that Sears issued from its warehouse and delivered to the driver when they showed up to pick up a load directed that the bills be sent to NLC. And, in fact, there's testimony that Sears made it clear that that's the way the transaction was going to work. Sears did not include non-recourse provisions in its bill of lading, and it didn't otherwise contract directly with Oak Harbor for a release of liability. So under the Hawkspire case, the Strzokin case, and the National case, the conclusion has to be that as between innocent parties, and we're talking about this $227,000 that somebody's going to have to either not get paid or pay twice, the risk falls on the shipper, Sears. When you look at the return shipments, which are the smaller portion of the bills of lading it issued, Sears was the consignee. The bills of lading that Oak Harbor issued were marked collect, making the consignee Sears liable. These bills of lading, unlike ones that you'll see in other cases that I alluded to earlier, were not marked prepaid. So even Sears couldn't argue somehow that it relied upon prepaid terms, which, frankly, would be preposterous because Sears obviously knew that it hadn't paid yet for those shipments. It wouldn't be paying for some time until the invoices were presented to it through National for payment. So then we have one case that kind of stands out by itself, and that's this Olson Distributing Systems case, which the district court here described as an outlier. And it clearly is. Neither the Hawkesbury or the National courts followed it. Obviously, our district court didn't follow it. And it's clearly at odds with the weight of authority. There's no policy underlying that decision. Mike, it's a classic example of bad facts make bad law. And it's distinguishable from our case. In that case, one of the --. There were two reasons, among others, that the court decided to let this ship around the block. One was that the carrier had delayed in sending its invoices, which at the time was a violation of a reg, which required that invoices be submitted within seven days. In some cases, if I recall the facts, invoices were submitted two or three months late. And during that time, the loss to the shipper increased because they were continuing to pay this middleman. Well, our case is different. Sears complains. I think I heard counsel say that NLC stopped paying as early as January 2004. I'm assuming that was just a mistake because there's no evidence in the record of that. But there is some evidence that payments started to slow down in June of 2004. And to put that in our timeline, things kind of came to a halt in November. So we're talking about between June and November. The complaint, and if you look at the briefing, the argument is that there was $300,000 outstanding from NLC that was beyond the 30-day payment terms. And that that was allowed by Oak Harbor without saying a word to Sears to balloon up to over $400,000 by the time this thing came to a close. Well, the fact of the matter is that the invoices we're trying to collect accrued between August and November, which means that the outstanding balances due in June were all paid. And the testimony is that as of November 12, I believe it is, when NLC was terminated by Sears, the amount outstanding, the $426,000, only $200,000 was beyond payment terms. So the reality is that actually things improved, didn't deteriorate during that period of time. Unless the Court has questions, I'd like to spend my last minute just talking about the prejudgment interest issue. Now we move into a different category in the sense that we're not talking now about de novo review. We're talking about abuse of discretion review. Prejudgment interest is recoverable on liquidated amounts. There's no dispute that the amount here is liquidated. Prejudgment interest is favored in the law. And the Court has – courts have said that a district court has broad discretion in determining the date from which prejudgment interest is to accrue. Sears complains that the district court abuses discretion in selecting such a date because there was no contract, they say, between Oak Harbor and Sears. Well, what the Court essentially did was to look at the course of dealings between the parties, the undisputed course of dealings between the parties, and determine a date by which in the normal course Sears would have had to remit funds to pay for the shipping charges. And if I recall correctly, that was December 14, 2004, and selected that date. You also have the fact that the bills of lading all incorporated the Oak Harbor tariff. The Oak Harbor tariff provides for 30-day payment terms. The law is that a shipper of goods is presumed to know the rules in the tariff. So we have a contractual basis, and we have the court looking at the facts and making a reasoned decision about when to calculate interest from. That leaves the last issue, and that is what rate do we select? The law is clear in the Ninth Circuit that if the case is a diversity case, that you apply State court law to determine the rate. It's undisputed that the Washington rate is 12 percent. Now, Sears complains that Federal law was used to analyze the dispute. Well, that doesn't matter. If it was a Federal law. The complaint is for money had and received under Washington law, correct? I'm sorry, I didn't hear you, Your Honor. The complaint is under Washington law for money had and received. It was filed in Washington and was removed on the basis of diversity by Sears. Sears complains that we should use the Federal rate because Federal law was applied to resolve the issues between the parties. I found no case that said that that made a difference unless it's a diversity – excuse me, unless it's a Federal question case or it's an admiralty case, which are the other cases that Sears cites. An admiralty is a carve-out. An admiralty, the court has authority to exercise broad discretion in applying the rate, and typically we use the Federal rate. Counsel, you have exceeded your time by quite a bit. But thank you. We appreciate your arguments. And I believe that Ms. Litt has some time remaining. Thank you, Judge. Your Honor correctly pointed out an oral argument. The argument there was no different than here. Judge Zille assumed away the facts of the case and asked us to assume if there was no broker and no separate contract for carriage and nothing else, what would the bills of lading constitute? And at that point he said, well, if there was no other arrangement among the parties, then we understood that a bill of lading could be a contract for carriage, but that wasn't this case. In this case, the bill of lading was the contract. Counsel's suggestion that the price, the essential term to render a bill of lading a contract, that the price can be supplied by the tariff, is not correct and not supported by the record. The tariff provided the basis by which NLC and O'Connor were able to make the case. The argument was that the contract of carriage supplied the price term here. Well, I'm not sure. Well, if that's the argument, then that is even more supportive to us because there's nothing. The bill at oral argument in the district court, OCARPA relied on the reference to the tariff price as being the basis for determining the price. It's undisputed that the bill of lading does not have a price. All it refers to is subject to the terms and conditions of the tariff. OCARPA argues, and I believe I understood and apologize to counsel and the bench if I misunderstood, but OCARPA argues that the tariff is the basis from which the discount is determined. Therefore, if you go to the tariff, you can figure out the price. No, I didn't understand that to be the argument. I thought he was just saying that, well, the bill of lading is still the contract of carriage, but it just incorporates a price from somewhere else other than the tariff. From where else? From the carrier contract. And if it's from the carrier contract, then they do work together and they can be harmonized. This Court in Toyota. I guess what he's saying is they can be harmonized in favor of Oak Harbor by simply having the bill of lading is the contract for carriage of Sears Goods and the price last term arises from the contract with NLC, which was your agent. That's what they're saying. The bill of lading is the contract. The price was negotiated in the carrier contract. Let me address the agency issue, Judge, because that issue was decided in favor of Oak Harbor in the district court. NLC argued that it was our agent and it attempted to avoid liability by saying we're just a bill-paying agent. Oak Harbor opposed that argument in the district court, succeeded, and got an independent judgment against NLC under the carrier contract because the court found absolutely in no uncertain terms that NLC was not our agent. That doesn't help me with the underlying question, so I'll leave the agency piece of it out of it. I understand their argument to be that with respect to Sears, the bill of lading is the contract for carriage, and it happens that the price term is negotiated in the carrier contract, and that's the price. So it's not without a price term. It's a price term by reference to the carrier contract. Why isn't that a perfectly appropriate way to pull those two contractual provisions together? Because it's not the way the parties did business. And, in fact, when they entered the contract, they knew the bill of lading was not a contract for carriage. Which it couldn't lawfully be. And everyone acknowledged that. So if it wasn't a lawful contract for carriage, then it was a receipt. They could not have lawfully, in 1992, when they entered the carrier contract, they could not have. Sotomayor, when did the damages in this case arise? A whole lot later than 1992, right? But they, but, but. By which time that was not a requirement of the law. I'm sorry? By which time that was not a requirement. Well, if anything, well, Oak Harbor argues that the change in the law makes a difference because the law became even more relaxed. The deregulation was perfect by the year that this occurred. And the rules that Oak Harbor is invoking are, frankly, paternalistic and protectionist rules that aren't found in the law anymore. The law today and the law then embraced freedom of contract. If the parties contracted to make an alternative arrangement, the bill of lading did not matter as a contract. Here, Oak Harbor is trying to fall back on presumptions that were not the reality of the commercial transaction among the parties here. They did not intend the bills of lading to be their contract, and they did intend that the carrier contract would govern the shipping transaction of the parties. And that's why Mr. Hartman testified that it was the own, Mr. Hartman of Oak Harbor, the signatory to the carrier contract, testified that it was the only contract for carriage of Sears goods that he was aware of. Thank you, Counsel. You've exceeded your time by a bit. Thank you. The arguments of both parties have been very helpful. And the case just argued is submitted. We'll take about a 10-minute break before hearing our final case of the morning. All rise. This court stands at ease. Thank you.
judges: Canby, Graber, Gould